## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

FLORIDA FAIR HOUSING ALLIANCE, INC.,

        Plaintiff,

vs.                           CASE NO. 1:20-cv-22665

THE PALM BAY GRAND, LLC
d/b/a PALM BAY GRAND,

        Defendant.

_____/

## THE PALM BAY GRAND'S MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3) and 12(b)(6), as well as Southern District Local Rule 7.1,  The Palm Bay Grand, LLC d/b/a Palm Bay Grand moves to dismiss the Plaintiff's Amended Complaint.[1]  For the reasons stated below, this Court should grant the requested relief.

## INTRODUCTION

The Plaintiff, the Florida Fair Housing Alliance, Inc., was incorporated by its president, Ryan Turizo, who is a serial litigant that has filed over 20 lawsuits in the Southern District of Florida in the past 18 months.  The earlier Fair Housing Act complaints named Mr. Turzio as the plaintiff, and described him as a Hispanic male with several felony convictions who serves as a tester.  *See e.g. Turizo v. Tamarac Pointe, Ltd*, USDC Case No.: 20-cv.60073-RUIZ at [D.E. 1 at ¶¶4, 8].  However, he recently changed his tactics and the complaints now list the Florida Fair Housing Alliance, Inc. as the plaintiff.  Despite changing who is the plaintiff, the more recent complaints, including the one pending before this Court, still suffer from the same defects as his prior lawsuits.  For example, the instant action was brought in the Southern District against the Palm Bay Grand, LLC, whose principal place of business is in the Middle District of Florida, regarding an apartment complex located in Melbourne, Florida.  The Amended Complaint's sole count is for allegedly violating 24 U.S.C. 3604(d), which makes it unlawful to misrepresent based on race that a dwelling unit is not available to rent.  Not only does the Amended Complaint fail to

---

[1] In accordance with Local Rule 5.1, this documents contains one and one-half inch spacing.

establish the claim is ripe for adjudication, it also fails to establish that the requisite standing exists, the ability to ever state a plausible claim or that the Plaintiff even commenced this action in the proper venue.   For those reasons, this Court should dismiss the Amended Complaint.

## I.     The Court Should Dismiss The Amended Complaint Because The Plaintiff Lacks Standing

"Because a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case . . . ." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).   "Article III of the United States Constitution 'restricts the jurisdiction of the federal courts to litigants who have standing to sue.'" *PDVSA US Litig. Trust v. Lukoil Pan Ams. LLC*, CASE NO. 1:18-CIV-20818-GAYLES, 2018 U.S. Dist. LEXIS 189801, *10  (S.D. Fla. Nov. 5 2018) (quoting *Nicklaw V. Citimortgage, Inc*., 839 F.3d 998, 1001 (11th Cir. 2016)).   Standing therefore "is not a mere pleading requirement but rather an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The "irreducible constitutional minimum of standing" comprises three elements: injury in fact, causation, and redressability. *See id.* at 560-61.   "Because the question of Article III standing implicates subject matter jurisdiction, it must be addressed as a threshold matter prior to the merits of any underlying claims."  *MSPA Claims 1, LLC*, Civil Action No. 18-23165-Civ-Scola, 2019 U.S. Dist. LEXIS 34386, *5 (S.D. Fla. March 5, 2019)  (*citing Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015).

"A motion to dismiss for lack of subject matter jurisdiction brought under Federal Rule of Civil Procedure 12(b)(1) may present either a facial or a factual challenge to the complaint." *Murciano v. Fla. Agency for Health Care Admin.*, Case No. 18-21621-CIV-GAYLES, 2020 U.S. Dist. LEXIS 39765, *4 (S.D. Fla. March 9, 2020).   "Notwithstanding whether the challenge is facial or factual, '[t]he burden for establishing federal subject matter jurisdiction rests with the party bringing the claim.'" *Lambe v. Allgate Fin., LLC*, Case No. 16-cv-24407-GAYLES, 2017 U.S. Dist. LEXIS 113555, *3 (S.D. Fla. July 20, 2017) (quoting *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005)).   When, as here, the attack on standing is facial, the plaintiff's allegations are taken as true for the purposes of the motion.  But the plaintiff "must allege facts that affirmatively and plausibly suggest it has standing to sue." *Amidax Trad. Grp. v. S.W.I.F.T. SCRL*, 631 F.3d 140, 145 (2d Cir. 2011).   The Court cannot "speculate concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none." *Miccosukee Tribe of Indians of Fla. v.*

*Florida State Ath. Comm'n*, 226 F.3d 1226, 1229-30 (11th Cir. 2000).  Reviewing the Amended Complaint's clearly establishes the Plaintiff has failed to satisfy its burden.

> **A.      The Amended Complaint does not establish Plaintiff's standing to sue on behalf of its members**

As stated above, the Plaintiff is suing Palm Bay Grand because it allegedly violated 42 U.S.C. § 3604(d) when contacted by a tester.  That section makes it illegal "[t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." Although testers, by definition, do not have a "bona fide" intent to rent – therefore precluding standing under Section 3604(a) - the United States Supreme Court concluded that a "tester who has been the object of a ***misrepresentation*** made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the [FHA's] provisions." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 364 (1982) (emphasis added).  Applying these principles, the Supreme Court held in *Havens* that the black tester – who was *falsely* told that housing was unavailable – had standing to sue individually based on the injury to her statutory right to truthful housing information under Section 3604(d).  *See id.* at 374.   On the other hand, the white tester in *Havens*, who was correctly told that housing was available, did not have standing because he did not allege "that he was the victim of a discriminatory misrepresentation," and therefore had not pled a cause of action under Section 3604(d).  *See id.* at 374-75.

In light of *Havens*, an association such as the Florida Fair Housing Alliance would only have standing to sue on behalf of its alleged members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief  requested requires the participation of individual members in the lawsuit." *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  Here, the Amended Complaint does not allege the Florida Fair Housing Alliance is a membership organization; that the "tester" is a member; or that the Florida Fair Housing Alliance is bringing suit on a member's behalf.  But in the event the Florida Fair Housing Alliance nevertheless attempts to claim associational standing, the tester in the case before this Court lacks standing for the same reasons as the white tester in *Havens*. The tester did not make a bona fide offer to rent which means it did not have standing under Section 3604(a).  *See Houston v. Marod Supermarkets,*

*Inc.*, 733 F.3d 1323, 1333 (11th Cir. 2013) ("a plaintiff seeking redress for an alleged refusal to sell or to rent housing on the basis of race must have made an actual 'bona fide' offer—not a mere 'tester'  Congress said so expressly in § 804(a) of the FHA.").  Furthermore, and viewed in the light most favorable to the Plaintiff, the tester was *truthfully* told that his felony conviction disqualified him from available housing – not that he was *falsely* told that available housing was *un*available.  Since the individual the tester spoke to did not make misrepresentations about the availability of units, Section 3604(d) also does not confer standing.  *See Havens*, 455 U.S. at 373. The Plaintiff has consequently failed to establish "tester" standing under *Havens*.   As such, the tester did not suffer a cognizable injury under the FHA and the Plaintiff has no right to bring an action on the tester's behalf. This Court should consequently dismiss the Amended Complaint for lack of standing.

### B.      The Amended Complaint Does Not Allege Standing To Sue On The Plaintiff's Behalf

Regarding organizational standing, the Supreme Court held in *Havens* that an organization may establish Article III standing if it shows "a concrete and demonstrable injury to the organization's activities" that is "more than simply a setback to the organization's abstract interests."  Following *Havens*, the United States Court of Appeals for the Eleventh Circuit has held organizational standing requires the pleader to show "the defendant's *illegal acts* impair its ability to engage in its projects by forcing the organization to devote resources to counteract those illegal acts." *Common Cause/Georgia v. Billups*, 554 F.3d 1350 (11th Cir. 2009) (emphasis added). Importantly, to qualify as a cognizable Article III injury, the organization's diverted resources must be independent of the cost of detecting and challenging allegedly unlawful conduct.  *See Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.2d 1153, 1166 (11th Cir. 2008) ("plaintiffs cannot bootstrap the cost of detecting and challenging illegal practices into injury for standing purposes").  For instance, in *Havens* the organizational plaintiff, HOME, alleged it was a housing nonprofit offering housing counseling and referrals.  *See Havens*, 455 U.S. at 363.  The defendant landlord discriminated against HOME's clients by falsely claiming that housing was unavailable, forcing HOME to expend additional resources to find these clients alternative housing.  *See id*. at 379.  When the landlord's "racial steering practices" interfered with HOME's ability to place clients in housing, HOME was forced to divert resources from its counseling efforts by using paired black and white testers to confirm the landlord's discriminatory policies, and, later, engage in litigation.  *See id*. at 368.

It cannot be overstated that diversion of resources supports an organizational injury for standing purposes *only when coupled with a plausibly illegal act*.  *See Common Cause/Georgia*, 554 F.3d at 1350 (explaining that "an organization has standing to sue on its own behalf if the defendant's *illegal acts* impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts") (emphasis added).  For the reasons stated below in Section IV, the Amended Complaint does not state a plausible claim of unlawful discrimination so the Court does not need to consider if the Plaintiff adequately pled a "diversion of resources."

Nevertheless, even if this Court considers the Amended Complaint's "diversion of resources" allegations,  those arguments like the rest of the Amended Complaint, are inadequate. Unlike the well-plead allegations in *Havens* about how and why the landlord's racial discrimination required HOME to divert resources from housing referrals and counseling to testing and litigation, the Amended Complaint offers no affirmative, plausible allegations – even on a general level - about *how* Palm Bay Grand's alleged practice of rejecting an unsubmitted rental application impaired the Plaintiff's vague "counseling," "education" and "outreach" and "projects."  *See* [D.E. 1 at ¶32].  Tellingly, the Amended Complaint lacks any details about these interrupted services or "projects," what "resources" were "diverted," or why the Plaintiff was "forced" to pursue litigation. Plus, no allegation establishes the amount of funds diverted were significant enough to meet the Article III test that an organization's injury be "palpable."

Indeed, the Amended Complaint's only allegations of ultimate fact prove litigation is the Plaintiff's *raison d'être*.  It is easily inferred from Paragraph Seventeen's description of the tester's conversation with "Julia" that their entire exchange was extremely brief.  Even if he spent an additional minute memorializing the words that were exchanged, the "injury" suffered is best described as *de minimus,* not palpable.  *See Havens Realty Corp.*, 455 U.S. at 379 (stating the injury must perceptively impair organization's ability to provide other services).   More importantly, because the pleading describes no costs beyond making that phone call and the litigation costs – a practice rejected in this circuit as impermissible bootstrapping insufficient to establish organizational injury – the Plaintiff has not established it suffered an injury, that Palm Bay Grand caused it, or that this Court can redress it.  *See Browning*, 522 F.2d 1153, 1166 (11th Cir. 2008).  This is another reason why the Court should dismiss the Amended Complaint.  *See also Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (finding organization "does not allege impairment of its ability to provide services" when it alleges "only impairment of its advocacy"); *Shield Our Constitutional Rights & Justice v. Hicks*, No. DKC 09-0940, 2009 U.S.

Dist. LEXIS 103006, *13 (D. Md. Nov. 4, 2009) ("Plaintiffs appear to allege that Shield suffered injury as a result of having to divert its resources from other programs in order to assist Plaintiff Huang. However, Plaintiffs fail to allege any specific facts to substantiate this bald allegation. . . . Plaintiffs' conclusory assertions are insufficient to establish organizational standing.").

Separately, there are no allegations supporting a "real or immediate threat of future injury" that would support the Florida Fair Housing Alliance having standing to seek injunctive relief. Indeed, the Amended Complaint's conclusory allegation of "irreparable loss and injury and a real and immediate threat of future discrimination" is unsupported by any factual allegations, and therefore is precisely the type of conclusory, "the-defendant-unlawfully-harmed-me" pleading deficiency disapproved by the United States Supreme Court. *See Iqbal*, 556 U.S. at 678.

## II.    The Court Should Dismiss The Amended Complaint Because The Southern District Is An Improper Venue

When jurisdiction is not founded on diversity, 28 U.S.C. Section 1391(b), governs whether venue is proper.  Section 1391(b) provides that venue is proper in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391.  Furthermore, pursuant to 28 U.S.C. § 1391(d), "in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State."

Applying Section 1391 to the facts before this Court shows the Southern District of Florida is an improper venue.   The Amended Complaint makes the conclusory statement that "[v]enue in this District is proper because Plaintiff resides in this district, Defendant transacts business in this district, and the complained conduct of Defendant occurred in this district."   [D.E. 1 at ¶7]. However, Section 1391(b) only considers the defendant's residence so the Plaintiff's residence is immaterial. *See Hicks v. Makaha Valley Plantation Homeowners Ass'n*, No. CIV. NO. 14-00254

HG, 2015 WL 328311, at *1 (D. Haw. Jan. 26, 2015) (denying venue in plaintiff's home state of Georgia for alleged housing discrimination relating to a property in Hawaii).  The Plaintiff concedes Palm Bay Grand has its principle place of business in Winter Park Florida and the property at issue is located in Melbourne, Florida.  Both of those locations are in the Middle District.  Furthermore, Palm Bay Grand's business activities are limited to owning the property in question, Palm Bay Grand does not have any employees in the Southern District of Florida, it does not advertise in the Southern District of Florida, none of the records regarding the Palm Bay Grand are located in the Southern District, it does not solicit potential tenants known to be living in the Southern District of Florida, it does not have business ties to the Southern District of Florida, it does not have any offices in the Southern District of Florida, one of Palm Bay Grand, LLC's members resides in Brevard County, Florida and the other member resides in Tennessee.  *See* the Affidavit of Justin Trimback, attached as Exhibit "A."  Section 1391(b)(1) does not confer venue in the Southern District.  *See* [D.E. 1 at 9, 13].

Turning to Section 1391(b)(2), the Amended Complaint's conclusory allegations about the Palm Bay Grand's business transactions and where the alleged conduct occurred are equally baseless, contradicted by the attached Affidavit and do not establish venue is proper in the Southern District of Florida.  *See generally Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988)  ("The facts as alleged in the complaint are taken as true to the extent they are uncontroverted by defendants' affidavits.").  "In analyzing whether the Southern District of Florida events or omissions are a 'substantial part' of the claims, the Court must 'focus on relevant activities of the defendant, not of the plaintiff.'" *Robey v. JPMorgan Chase Bank, N.A.*, 343 F. Supp. 3d 1304 (S.D. Fla. 2018) (quoting *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371-72 (11th Cir. 2003)).  "Only the defendant's activities 'that directly give rise to a claim are relevant.  And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered.'" *Robey*, 343 F. Supp. 3d at 1314 (quoting *Jenkins Brick*, 321 F.3d at 1371).  According to the Amended Complaint, Palm Bay Grand, whose principal place of business is located in the Middle District of Florida, has a practice of turning away felons who seek to rent units at its Melbourne, Florida complex.  *See* [D.E. 1 at ¶¶3 and 38].  The Amended Complaint further asserts that on May 6, 2020, a field tester called the Melbourne, Florida location and spoke with someone named Julia.  *See* [D.E. 1 at ¶17].  The field tester allegedly asked Julia if his felony conviction would disqualify him from renting an apartment and Julia responded

affirmatively.  *See* [D.E. 1 at ¶17].

Since the only relevant actions are Palm Bay Grand's, it is abundantly clear that the substantial activities giving rise to the alleged claim occurred in the Middle District of Florida. The Plaintiff cannot even rely on the single telephone call with Julia because it was the tester who initiated the call and the Eleventh Circuit has held that a defendant answering a telephone call does not subject the defendant to jurisdiction.  *See e.g. Sun Bank, N.A. v. E.F. Hutton & Co., Inc*., 926 F.2d 1030, 1034 (11th Cir. 1991) (finding no personal jurisdiction where defendant merely received and returned phone calls from Florida, during which it made allegedly fraudulent statements).  *See also Hou v. United Airlines Corp.*, Case #: 8:06-CV-1502-T-27TGW, 2006 U.S. Dist. LEXIS 73790 (M.D. Fla. Oct. 10, 2006) (holding the plaintiff calling the defendant from the Middle District was insufficient to confer jurisdiction on the Middle District);  *Fox v. Boucher*, 794 F.2d 34, 37 (2d Cir. 1986) ("It would offend 'minimum contacts' due process principles to force [the defendant], a Massachusetts resident, to litigate in a New York forum on the basis of one telephone call.").  Finally, the Florida Fair Housing Alliance is unable to rely on Section 1391(b)(3) because venue is proper in the Middle District of Florida.  This Court should consequently dismiss this action because the Southern District of Florida is an improper venue.

### III.    To The Extent The Court Does Not Dismiss The Amended Complaint, The Court Should Transfer The Litigation To The Middle District of Florida

"Congress authorized courts to transfer the venue of a case in order to avoid unnecessary inconvenience to the litigants, witnesses, and the public, and to conserve time, energy, and money." *Cellularvision Tech. & Telecomms., L.P. v. Alltel Corp.*, 508 F. Supp. 2d 1186, 1188-89 (S.D. Fla. 2007). "To prevail on a motion to transfer made pursuant to Section 1404(a), the moving party must show that: (1) an adequate alternative forum is available; (2) the public and private factors weigh in favor of transfer; and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice."  *Podhurst Orseck, P.A. v. Servicios Legales De Mesoamerica S. De R.L.*, 699 F. Supp. 2d 1344, 352 (S.D. Fla. 2010).

Regarding the first factor listed in *Podhurst Orseck, P.A.*  "[t]he burden of establishing whether an alternative forum exists is not a heavy one." *Warter v. Boston Sec., SA.*, 380 F. Supp. 2d 1299, 1306-07 (S.D. Fla. 2004) (internal quotation marks and citation omitted).  "[A] forum is available if it is amenable to service of process or the opposing party consents to jurisdiction in the alternative forum." *Perez-Lang*, *S.A.*, 575 F. Supp. 2d  at 1349.  Moreover, "[a] forum is generally adequate if it can provide some relief for Plaintiff's claims."  *Id.*  "An alternative forum

is presumed 'adequate' unless the plaintiff makes some showing to the contrary." *Da Rocha v. Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318, 1322 (S.D. Fla. 2006). Here, the United States District Court for the Middle District of Florida is an appropriate forum because Palm Bay Grand is a resident of the Middle District of Florida and a substantial part of the alleged events or omissions giving rise to the lawsuit occurred there.

### A.    The Private Factors Strongly Favor Transferring This Action If The Court Does Not Dismiss The Lawsuit

As stated by the Supreme Court when discussing inconvenient forums, "[a] citizen's forum choice should not be given dispositive weight. . . . As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or for the court, dismissal is proper." *Piper Aircraft v. Reyno*, 454 US 235, 246 n.23 (1981). Thus, courts consider a number of factors when deciding whether to transfer a case. The "[p]rivate-interest factors include 'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Gaub v. Wal-Mart Stores, Inc.*, CASE NO. 12-80654-CIV-MARRA, 2012 U.S. Dist. LEXIS 158991, *9 (S.D. Fla. Nov. 6, 2012) (quoting *American Dredging Co. v. Miller*, 510 U.S. 443, 448 (1994)).

The first factor weighs heavily in favor of the Middle District of Florida because all of Palm Bay Grand's records are located in the Middle District of Florida. Turning to the second private factor, at least one of Florida's federal courts has remarked that "[o]f all of the private interest factors, the relative ability of the forums to compel the attendance of significant unwilling witnesses at the trial often is considered the most important factor, because the presentation of live testimony is essential to a fair trial." *Estate of Gutierrez v. Ford Motor Co*., No., CASE NO: 8:02 CV-676-T-17 EAJ,  2004 U.S. Dist. LEXIS 7535, *28 (M.D. Fla. Apr. 19, 2004). In fact courts in the Eleventh Circuit, including the Southern District of Florida, have already held the need to resort to videotaped depositions or letters rogatory strongly supports dismissing an action:

> Plaintiff argues that the witnesses' testimony  could be obtained through other means, such as videotaped depositions or letters rogatory. But given the importance of these witnesses in assessing the disputed factual issues, the Court finds that no adequate substitute exists for the witnesses' live testimony and that the lack of access to this testimony weighs very strongly in favor of dismissal.

*Montgomery v. Oberti*, 945 F. Supp. 2d 1367, 1376 (S.D. Fla. May 16, 2013).

Palm Bay Grand does not have any employees and the property is managed through a non-party whose employees would be called as witnesses. *See* Exhibit A. Those individuals, including Julia Williams, have knowledge of the policies and procedures regarding potential applications, the submitted rental applications, which applications were denied and reasons for the denials. *See id.* Julia Williams is also an important witness because the Plaintiff brought this action based on her alleged conversation with the Plaintiff's tester. None of these non-party witness can be compelled to testify in the Southern District of Florida's Miami Division because they reside beyond the 100-mile radius of the trial location. *See* Fed. R. Civ. P. 45(c)(1)(A). Securing testimony of these witnesses without the availability of compulsory process would likely cause inconvenience and unnecessary expenses. In contrast, the identified witnesses would be subject to compulsory service if the litigation occurred in the Middle District of Florida's Orlando Division. Thus, if this Court does not dismiss the Amended Complaint, it should transfer the lawsuit to the United States District Court for the Middle District of Florida.

**B.      The Public Interest Factors Strongly Favor Transferring The Action If The Court Does Not Dismiss The Lawsuit**

The public factors also weigh heavily in favor of transferring the case to Middle District of Florida if the Court declines to dismiss the lawsuit. The public interest factors include (1) "the administrative difficulties flowing from court congestion"; (2) "the local interest in having localized controversies decided at home"; (3) "the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action"; (4) "the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law"; and (5) "the unfairness of burdening citizens in an unrelated forum with jury duty." *McLane v. Marriott Int'l, Inc.*, 547 Fed. Appx. 950, 958 (11th Cir. 2013) (quoting *Piper Aircraft v. Reyno*, 454 U.S. 235, 240 n.6) (internal quotation marks omitted). As remarked by the United States Supreme Court, "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-9, (1947). Furthermore, "[t]he Southern District of Florida has one of the busiest dockets in the country." *Ballard*, 2014 U.S. Dist. LEXIS 133512 at *9. "Indeed, the action would be an unfair burden on jurors in this district" because the litigation involves an apartment complex in Melbourne, Florida. *See id.* Thus, the public interest factors also weigh heavily in favor of the Middle District of Florida.

**IV.    This Court Should Dismiss The Amended Complaint Because It Fails To State A
Claim for Disparate Impact Discrimination**

When a defendant files a motion to dismiss for failure to state a claim under Federal Rule
of Civil Procedure 12(b)(6), the court must determine if the plaintiff has alleged "enough facts to
state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombl*y, 550 U.S. 544,
570 (2007).   The complaint must contain "factual content that allows the court to draw the
reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009).  "Mere labels and conclusions or a formulaic recitation of the elements
of a cause of action will not do, and a plaintiff cannot rely on naked assertions devoid of further
factual enhancement."  *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013).  To survive, a
plaintiff must "raise a right to relief above the speculative level" and "nudge[] their claims across
the line from conceivable to plausible." *Twombly*, 550 U.S. at 547.  Although courts are required
to accept allegations as true and make all plausible inferences in the plaintiff's favor, courts "are
not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555.

Claims of disparate impact discrimination under the Fair Housing Act are subject to
heightened pleading standards.  Pursuant to the United States Supreme Court's decision in *Texas
Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.,* 135 S. Ct.
2507 (2015), racial imbalance, standing alone, does not establish a prima facie claim of disparate
impact housing discrimination.  Instead, "[d]isparate-impact liability under the Fair Housing Act
requires proof that a policy or practice of the defendant has a 'disproportionately adverse effect on
minorities.'" *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1296 (11th Cir. 2019)
(quoting *Inclusive Cmtys.*, 135 S. Ct. at 2513).  "Without adequate safeguards at the prima facie
stage, disparate-impact liability might cause race to be used and considered in a pervasive way and
'would almost inexorably lead' governmental or private entities to use 'numerical quotas,' and
serious constitutional questions then could arise."  *Inclusive Cmtys.*, 135 S. Ct. at 2523.  "Courts
must therefore examine with care whether a plaintiff has made out a prima facie case of disparate
impact and prompt resolution of these cases is important. A plaintiff who fails to allege facts at the
pleading stage or produce statistical evidence demonstrating a causal connection cannot make out
a prima facie case of disparate impact." *Id.*  "Difficult questions might arise if disparate-impact
liability under the FHA caused race to be used and considered  in a pervasive and explicit manner
to justify governmental or private actions that, in fact, tend to perpetuate race-based considerations
rather than move beyond them. Courts should avoid interpreting disparate-impact liability to be so

expansive as to inject racial considerations into every housing decision." *Id.* at 2524. "The limitations on disparate-impact liability discussed here are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.*

Based on the concerns mentioned above, three requirements must be satisfied in order to plead a claim for disparate-impact liability. "First, a prima facie case requires 'the identification of a specific, facially-neutral . . . practice' or policy." *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1296 (11th Cir. 2019) (quoting *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 1268 (11th Cir. Aug. 4, 2000)). "Second, the plaintiff must establish the existence of a 'significant statistical disparity' between the effects of the challenged policy or practice on minorities and non-minorities." *City of Miami Gardens*, 931 F.3d at 1296 (*Joe's Stone Crab*, 220 F.3d at 1274). "A plaintiff who fails to . . . produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Inclusive Cmtys.*, 135 S. Ct. at 2523. Furthermore, a disparate-impact claim "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* "Third, in the light of the 'serious constitutional questions that might arise . . . if such liability were imposed based solely on a showing of statistical disparity,' a plaintiff proceeding on a disparate-impact theory must also establish a 'robust causality' connecting the challenged policy and the statistical disparity." *City of Miami Gardens*, 931 F.3d at 1296 (quoting *Inclusive Cmtys.*, 135 S. Ct. at 2512). "A robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Tex. Dep't of Hous. & Cmty. Affairs,* 135 S. Ct. at 2523 (citing *Wards Cove Packing Co. v. Atonio*, 490 U. S. 642, 653 (1989), superseded by statute on other grounds, 42 U. S. C. §2000e-2(k)). Put simply, a disparate impact discrimination claim fails at the pleading stage unless the plaintiff demonstrates *both* relevant statistical disparity and a plausible showing of "robust causality" between the offending policy and the statistical disparity. *See Inclusive Cmtys.*, 135 S. Ct. at 2522-23. This is a burden the Fair Housing Alliance has not met.

Regarding the mandatory statistics, the United States Court of Appeals for the Eleventh Circuit has already held a plaintiff is required to utilize statistics from the relevant geographic area. For instance, in *Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo*, 759 Fed. Appx. 828 (11th Cir. 2018), real estate developers in the Oviedo Town Center sued the City of Oviedo (the "City") for violating the Fair Housing Act and asserted the City changing its utility rate policies caused a disparate impact on minorities. According to the Eleventh Circuit, "in order to establish a prima

facie case of disparate impact, the appellants would have needed to draw a comparison between (a) the percentage of racial minorities occupying multifamily properties impacted by the 2012 Policy throughout the City of Oviedo and (b) the percentage of non-minorities living in such properties, again throughout the City of Oviedo." *Oviedo Town Ctr. II, L.L.L.P.*, 759 Fed. Appx. at 835. "This kind of citywide comparative analysis would be necessary because, since the policy impacts the whole city, the whole city would need to be evaluated before we could determine that the claimed impact might have disparately fallen on certain insular groups. " *Id.* Instead of submitting that information, the plaintiffs in that case relied on data showing the percentage of racial minority heads of households in the Oviedo Town Center was greater than the percentage of racial minority households throughout the City of Oviedo. *See id.* at 833. The Eleventh Circuit held "this data revealed only that more racial minorities live in Oviedo Town Center than lived in the rest of the City of Oviedo. It does not establish a disparate impact, let alone any causal connection between the 2012 Policy and the disparate impact." *Id.* at 835. The Eleventh Circuit said its evaluation of the lawsuit "need go no further because this necessarily fails to make out a prima facie case." *Id.* at 836. "[T]he developers here have 'completely failed to present relevant comparative evidence' and 'the district court was right to reject [the] disparate impact claim.'" *Id.* at (quoting *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008)).

### A.     The Amended Complaint Fails To Provide The Required Statistics

Like the developers in *Oviedo Town Ctr. II, L.L.L.P.*, the Florida Fair Housing Alliance has also woefully failed to satisfy its burden. Based solely on a single telephone call, the Amended Complaint asserts "Defendant's practice or otherwise policy regarding the criminal history of individuals seeking to rent," has "a disparate impact on Black and Hispanic individuals and otherwise fails to serve a substantial, legitimate, nondiscriminatory interest of the housing provider." *See* [D.E. 1 at ¶31]. The Amended Complaint does not allege the tester applied for housing and was denied. In fact, the Amended Complaint does not state the tester even submitted an application. The Florida Fair Housing Alliance nevertheless alleges "it has suffered, is suffering, and will continue to suffer irreparable loss and injury and a real and immediate threat of future discrimination by Defendant." [D.E. 1 at ¶41]. These boilerplate allegations and conclusions fail to state a cognizable disparate impact housing discrimination claim.

In addition, the Amended Complaint is devoid of the required statistics and causal connection, which would consist of data concerning any racial disparities in the number of black and Hispanic rental applicants in proportion to the pool of potentially qualified tenants for Palm

Bay Grand's units.  Pursuant to *Oviedo Town Ctr. II, L.L.L.P*, the Plaintiff would have needed to draw a comparison between (a) the percentage of minorities occupying apartments at the Palm Bay Grand and (b) the percentage of minorities living in Melbourne, Florida.  Disregarding the binding precedent, the Amended Complaint merely relies on HUD Guidelines, national arrest and incarceration data from the Bureau of Justice Statistics, and the U.S. Department of Commerce's data about the total number of minorities in the United States compared to non-minorities.  *See* [D.E. 1 at ¶¶11-12].  Those documents and the Amended Complaint lack statistical support for the alleged disparate impact of a policy excluding only convicted felons.  Moreover, the data the Amended Complaint relies on is from nationwide arrest and incarceration statics and is devoid of information regarding felony convictions in Melbourne, Florida.  Thus, in accordance with the Eleventh Circuit prohibiting "bald assumption" with "no comparative data at all" about alleged disparate impacts, this Court should dismiss the Amended Complaint.  *See Oviedo Town Ctr. II, L.L.L.P.*, 759 F. App'x at 835.  *See also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008) ("Gulf Coast presented no comparative data at all, relying instead on the bald assumption that because the halfway houses at issue in this case cannot be used for short-term group living, the occupancy-turnover rule must necessarily create a disparate impact on the handicapped. . . . Because Gulf Coast has completely failed to present relevant comparative evidence, the district court was right to reject its disparate impact claim.").

**B.     The Amended Complaint Does Not Satisfy The Supreme Court's Robust Casualty Standard**

Along with fatally omitting the required statistics, the Amended Complaint also fails to allege a causal link between the policy and statistical disparities as required by the Supreme Court's "robust causation standard."  The Amended Complaint would have then needed to show Palm Bay Grand's policy of allegedly denying applications submitted by felons has caused a disparate impact in that Melbourne, Florida location.  Instead, the Amended Complaint merely repeatedly argues the policy is discriminatory because the individuals affected by it are minorities.  Tellingly, the Plaintiff has not even asserted any data showing the racial makeup of convicted felons in the Defendant's actual or potential tenant pool of Melbourne, Florida, or that there are racial disparities in housing in Melbourne, Florida.  The Plaintiff is apparently hoping that extrapolation of nationwide data regarding arrests and incarcerations will yield parallel results at the community level and in particular the property in Melbourne, Florida where the alleged discrimination took place.  Such speculation, however, hardly establishes the required "robust"

causation necessary to state a claim for disparate impact regarding felonies in Melbourne. Furthermore, the Honorable Jose A. Gonzalez, Jr. of the United States District Court for the Southern District of Florida already rejected the argument that all policies have a disparate impact against minorities. *See E.E.O.C. v. Carolina Freight Carriers Corp.*, 723 F. Supp. 734, 752 (S.D. Fla. 1989) ("plaintiff's position that minorities should be held to lower standards is an insult to millions of honest Hispanics."). Since the Amended Complaint woefully fails to show a robust causation, the Plaintiff has failed to plead a cause of action that minorities are disproportionately convicted of felonies and the Palm Bay Grand's alleged policy of denying applications submitted by felons caused a disparate impact at that Melbourne, Florida location. This is yet another reason why the Plaintiff has failed to satisfy its burden and this Court should dismiss the Amended Complaint. *See also Inclusive Communities Project, Inc. v. Heartland Cmty. Ass'n, Inc.*, 399 F. Supp. 3d 657, 667 (N.D. Tex. 2019) (granting motion to dismiss disparate impact housing discrimination claim for failure to plead robust causation between policy and statistical racial disparities).

### C.     Absent Evidence Of Disparate Impact Upon A Protected Class, A Facially Neutral "Criminal Record" Policy Is Lawful.

The Plaintiff's main allegation is that Palm Bay Grand has a "practice" of "without any review or investigation, turning away individuals with a felony criminal record." [D.E. 1 at ¶38]. Courts throughout the United States have recognized defendants do not violate the Fair Housing Act when their race neutral policies result in denying housing to felons. For instance, in *Carson v. Hernandez*, CIVIL CASE NO. 3:17-CV-1493-L-BK, 2018 U.S. Dist. LEXIS 185782 (N.D. Tex. July 26, 2018), the plaintiff sued VOA/Prairie Creek Village Apartments and its manager, Sofia Hernandez, alleging violations of the Fair Housing Act. *See Carson v. Hernandez*, CIVIL CASE NO. 3:17-CV-1493-L-BK, 2018 U.S. Dist. LEXIS 185782 *1 (N.D. Tex. July 26, 2018). The plaintiff contended the facility denying his rental application because of felony convictions "'amounts to a ban against African-Americans and has an adverse discriminatory effect,' because, as an African American, he 'is part of a disproportionate number of those convicted and imprisoned and convicted in Texas.'" *Carson*, 2018 U.S. Dist. LEXIS 185782 at *2. In support of that argument the plaintiff asserted that

> In 2014, African-American [sic] comprised approximately 36 percent of the total population, yet [sic] incarcerated at a rate nearly three times their proportion of the General Population. The Defendants [sic] Practice and Policy that deny Housing to

those Released from Prison is critical for any successful reentry to society, and such policy is equally disparate and discriminates against African-Americans.

This in conjunction with the racial aspect of those that are convicted in Texas, in 2005, the racial conviction rate in Texas per 100,000 of the Population came to: 'Whites 667; Blacks 3167; Hispanics 830.' . . . The Defendants Policy represents a discriminatory policy.

*3-4

When ruling on the defendant's motion to dismiss the United States District Court for the Northern District of Texas asserted "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id.* at *5 (quoting *Inclusive Cmtys*., 135 S. Ct. at 2523). Reviewing the complaint showed the plaintiff had "not identified any specific policy or practice of Defendants that caused a disparate impact on a protected group. He avers only generally that the "practice and policy" to deny housing to those released from prison and cites a purported disparate impact on African Americans based on statistical data." *Id.* at *6. That court further held "[a]ssuming, arguendo, that Defendants had a policy of rejecting applicants with felony convictions, regardless of the age of those convictions, Plaintiff has wholly failed to demonstrate a 'robust' causal connection between the alleged policy or practice and the perceived adverse discriminatory effect." *Id.* at *6. This is because "a policy of excluding convicted felons from tenancy did not cause the underlying disparity Plaintiff cites, to-wit, the historical disproportion of African Americans convicted of felony offenses in the United States. [] In any event, such a policy is not 'otherwise unjustified by a legitimate rationale,' as it is obviously pertinent to maintaining a crime-free environment." *Id.* at *7. Since the complaint contained "no facts that would support the plausible inference of a 'robust' causal link between a specific policy or custom of Defendant and an adverse effect on African Americans," the court dismissed the complaint with prejudice *See id.* at *7, 11.

The United States District Court for the Southern District of New York reached the same conclusion. In *McKins v. Pye*, 19-CV-4633 (LLS), 2019 U.S. Dist. LEXIS 123450 (S.D.N.Y. July 22, 2019), an African American male was arrested in 1983 and convicted in 1984. In 2018 an apartment complex informed him that a unit was available to rent but his application was denied because of his prior arrest and conviction. The district court held those allegations failed to establish a disparate-impact claim under the Fair Housing Act because they do not "plead facts demonstrating that [the apartment complex] has a policy or practice that has caused or predictably will cause a discriminatory effect." *McKins*, 2019 U.S. Dist. LEXIS 123450 at *5. *See also Hall*

*v. Phila. Hous. Auth.*, CIVIL ACTION No. 17-5753, 2019 U.S. Dist. LEXIS 60679 *10-11 (E.D. Pa. April 9, 2019) (dismissing a complaint because it was permissible to have a policy that rejected all applicants who had a household member who had been convicted of a homicide-related offense); *Evans v. UDR, Inc.*, 644 F. Supp. 2d 675, 691 (E.D.N.C. 2009) ("the FHAA clearly does not prohibit landlords from denying a person occupancy on the basis of his criminal record").

### D.    The Amended Complaint's Reliance On HUD Guidance Is Irrelevant

As stated above, the Amended Complaint contends this Court should be rely on HUD Guidance from 2016.  *See* [D.E. 1, Page 7].  The Florida Fair Housing Alliance's reliance on, and citations to the 2016 HUD Guidance is woefully misplaced.  The HUD Guidance does not say an entity violates the FHA by utilizing a policy that denies all rental applications submitted by felons. The HUD Guidance actually says blanket denials, like any other challenged policy, that are shown to have a discriminatory effect would violate the FHA.  The HUD Guidance further explains that a policy which implements an "individualized assessment" of criminal record "is likely to have a less discriminatory effect."  *See* HUD Guidance at Page 7.

Disregarding what the HUD Guidance states, the Plaintiff has stretched HUD's proposition and contends a blanket prohibition regarding an applicant's "felony" criminal history "is unlawful under the Fair Housing Act" because all blanket prohibitions is allegedly discriminatory.  *See* [D.E. 1 at ¶31].  Based on its misconception about what the HUD Guidance says, the Plaintiff asserts Palm Bay Grand should be required to revise the way it uses criminal records.   *See* [D.E. 1 at ¶¶ 19 and 33].  However, HUD's Guidance cannot be stretched to conclude that every policy which omits an individualized assessment is discriminatory.  Any particular race-neutral policy may only be discriminatory when shown statistically to have caused a disparate impact on a protected class. The Plaintiff's statement of the law regarding the HUD Guidance is therefore incorrect and its application to the facts before this Court reaches an unsubstantiated conclusion.

Not only has the Plaintiff misconstrued HUD's 2016 Guidance, its reliance on that document is also immaterial because Agency Guidance is not the law.  Courts allow an agency "a measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159(2012) (quoting *United States v. Mead Corp.*, 533 U. S. 218, 228 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U. S. 134, 140 (1944)).  The United States Court of Appeals for the Eleventh Circuit has previously held *Skidmore* affords a "lesser," *Quinchia v. United States Attorney General*, 552 F.3d

1255, 1258-59 (11th Cir. 2008), and "more limited," *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1268 n.5 (11th Cir. 2008), degree of deference than *Chevron* — meaning, a fortiori, that an interpretation under the *Skidmore* standard must be more than merely "reasonable."   Thus, while an agency's interpretation has the "power to persuade," it "lack[s] the power to control." *Skidmore*, 323 U.S. at 140.

In *Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849 (11th Cir. 2009), the Eleventh Circuit discussed how much weight should be given to HUD Guidelines.   According to the Eleventh Circuit, "[b]ecause the HUD Guidelines are not 'published regulations subject to the rigors of the Administrative Procedure Act, including public notice and comment,' they do not deserve full Chevron deference."   *Stein, LLC*, 586 F.3d at *6.   The Eleventh Circuit explicitly said "great weight" was   "far more weight than we can give them under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)."   *Stein*, 586 F.3d at n.4.   In fact, the Eleventh Circuit said "[l]ittle or no deference is due to the guidelines," because "[n]o reasoning at all, much less thorough reasoning, is provided" for a proposition and the guidelines were internally inconsistent.   *Id.* at n.6.

Finally, even if the HUD Guidance was binding on this Court, which it is not, the HUD Guidance heavily relies on the United States Court of Appeals for the Eighth Circuit's decision in *Green v. Missouri Pac. R.R. Co.*, 523 F. 2d 1290 (8th Cir. 1975), for the proposition that blanket denials for "any conviction," could support a disparate impact claim.   In *Green*, the plaintiff sued for employment discrimination based on the employer's policy of disqualifying all job applicants with a conviction for any crime other than a minor traffic offense.   *See Green*, 523 F.2d at 1292. The Eighth Circuit held the company's policy violated Title VII because it could not meet the business necessity test.   *See id.* at 1296-98.

Not only does the case before this court not concern employment discrimination, after HUD issued the 2016 Guidance the United States Court of Appeals for the Eighth Circuit clarified *Green* in *Eggers v. Wells Fargo Bank N.A.*, 899 F.3d 629, 634-35 (8th Cir. 2018).   In *Eggers* the Eighth Circuit discussed *Green* and said that blanket denials for all for employment applicants convicted of theft crimes did not support a prima facie claim for disparate impact discrimination. Since the Eighth Circuit has modified *Green*, HUD's reliance on *Green* is no longer justified.

Despite the Eighth Circuit using *Eggers* to clarify *Green*, some plaintiffs, including the Florida Fair Housing Alliance, have misconstrued *Green* to mean that any policy which excludes applicants on the basis of any conviction is prohibited.   As stated above, that is not the law in the Eighth Circuit and it is also not the law in  the United States District Court for the Southern District

of Florida.  In *EEOC v. Carolina Freight Carriers Corp.*, 723 F. Supp. 734 (S.D. Fla. 1989) Francisco Rios was convicted of a felony and sentenced to prison.  When he applied to work at Carolina Freight Carriers Corp. he lied on the application and said he was never convicted of a crime other than a traffic offense.  *See EEOC*, 723 F. Supp. at 737.  Although he was initially hired, the district manager eventually fired him because of his conviction.  *See id.* at 742, 749.

The Equal Employment Opportunity Commission ("EEOC") subsequently sued Carolina Freight Carriers Corp. in the Southern District of Florida for maintaining a discriminatory employment practice.  *See id.* at 750.  Relying on *Green*, the EEOC asserted Carolina Freight Carriers Corp. refusing to employ people with a felony conviction had a disparate impact upon Hispanics.  *See id.*  The United States District Court for the Southern District rejected that argument because

> While *Green* could be limited to those situations where the linkage between the employer's business needs and the conviction policy is minimal, the case may also be broadly read to bar all employment conviction policies. With all due respect to the members of the Eighth Circuit, their holding is ill founded.

*Id.* at 752.  The Southern District further said the EEOC failed to establish that any imbalance in the number of Hispanic drivers was caused by the conviction bar.  *See id.* at 751.  Nor did the EEOC establish a "significant number" of Hispanic drivers were disqualified because of the conviction policy or deterred from applying because of the policy.  *See id.*  When entering a judgment against the EEOC, Senior District Judge Jose A. Gonzalez, Jr. specifically stated "plaintiff's position that minorities should be held to lower standards is an insult to millions of honest Hispanics." *Id.* at 752, 756.  He also stated the following, which unambiguously contradicts the Amended Complaint before this Court:

> [a] past criminal record affords no basis to predict that a given person will commit a future crime. But the evidence indicates that a group of persons who have been convicted of serious crimes will have a higher incidence of future criminal conduct than those who have never been convicted.

*E.E.O.C.*, 723 F. Supp. at 753.  Accordingly, the Plaintiff's Amended Complaint is fundamentally flawed because it is based on *Green*, a non-binding decision from the Eighth Circuit, that is contrary to that Circuit's law governing criminal background policies in the disparate impact discrimination context.  More importantly, the Southern District of Florida has rejected *Green*. The Amended Complaint consequently fails to state a cause of action and should be dismissed.

Other federal appellate courts have also held a plaintiff cannot establish a disparate-impact simply because of Agency Guidelines.  For instance, in *Hardie v. NCAA*, 876 F.3d 312 (9th Cir. 2017), the plaintiff, who was an African American, sued the National Collegiate Athletic Association ("NCAA") because the NCAA excluded individuals with felony convictions from coaching at youth athletic tournaments.  The plaintiff contended that excluding all individuals with felony convictions has a disparate impact on African Americans.  *See id.* at 315, 318.  In addition, the plaintiff in that case, like the plaintiff in the case before this Court, also relied on EEOC Guidelines to avoid discriminating based on race.  *See id.* at 323.  The EEOC Guidelines were similar to HUD's and recommended employers adopt individualized assessments as a tool to avoid Title VII liability in the employment context.  *See id.*

On appeal to the United States Court of Appeals to the Ninth Circuit, the NCAA asserted excluding coaches with felony convictions served the interest in protecting children and the integrity of the NCAA's recruiting process because "even after many years have passed, the risk of future arrest for someone who has a criminal record may remain higher than the risk of future arrest for someone who has never been arrested." *See id.* at 321.   The United States Court of Appeals for the Ninth Circuit ultimately rejected the plaintiff's reliance on the EEOC Guidelines and affirmed the order appealed.  *See id.* at 323.  That decision consequently provides an additional reason why this Court should reject the Amended Complaint's flawed assertion that failing to conduct HUD's suggested individualized assessment constitutes discrimination.

For all these reasons, this Court should dismiss the operative complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3) and 12(b)(6).  The dismissal should be entered with prejudice as it is clear that an any attempt to amend would be futile because the Florida Fair Housing Alliance will never be able to establish a claim for disparate impact.

Respectfully submitted,

HINSHAW AND CULBERTSON, LLP

s/MELISSA GILLINOV
Melissa Gillinov, Esq.
Florida Bar No. 11892
mgillinov@hinshawlaw.com
2525 Ponce de Leon. Blvd.
Miami, Florida 33434
Telephone: 305-358-7747
Facsimile: 305-577-1063
*Counsel for The Palm Bay Grand, LLC*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 27, 2020, I e-filed this document using the CM/ECF system.  I further certify that I am unaware of any non-CM/ECF participants.

/s/MELISSA GILLINOV
Melissa Gillinov