**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

FLORIDA FAIR HOUSING ALLIANCE, INC.,

          Plaintiff,

vs.                               CASE NO. 1:20-cv-22665

THE PALM BAY GRAND, LLC
d/b/a PALM BAY GRAND,

          Defendant.

_____/

**THE PALM BAY GRAND'S MOTION TO DISMISS**

       Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3) and 12(b)(6), The Palm Bay Grand, LLC d/b/a Palm Bay Grand[1] moves to dismiss the Plaintiff's Amended Complaint with prejudice.[2]  For the reasons stated below, this Court should grant the requested relief.

**INTRODUCTION**

       On August 11, 2006, Ryan Turizo was sentenced to ten years in prison for burglary of a dwelling, five years for grand theft and five years for cocaine possession.  *See* the Florida Department of Corrections, Inmate Release Information Detail, attached as Exhibit "A."[3]  He was released from prison on March 1, 2015 and submitted the Plaintiff's Articles of Incorporation five years later, on February 13, 2020.  *See id.*  *See also* the Electronic Articles of Incorporation,

---

[1] The Amended Complaint incorrectly refers to The Palm Bay Grand, LLC as The Palm Grand, LLC.

[2] In accordance with Southern District Local Rule 5.1, this documents contains one and one-half inch spacing.

[3] Federal Rule of Evidence 201 authorizes this Court to take judicial notice on its own initiative of facts that can be readily determined.  For instance, "[w]hen considering a motion to dismiss, the Court may take judicial notice of the contents of relevant public records."  *Prof'l Led Lighting, Ltd. v. Aadyn Tech., LLC*, 88 F. Supp. 3d 1356, n.2 (S.D. Fla. Feb. 17, 2015) (internal citations omitted).  The public records attached to this Motion are relevant because they show the disingenuous nature of the Plaintiff's Amended Complaint.  Considering these documents at the motion to dismiss stage does not require conversion to the summary judgment stage.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999).

attached as Exhibit "B."  On June 23, 2020, which was a mere three days before this lawsuit commenced, Ryan Turizo completed, signed and submitted on the Plaintiff's behalf an application to the State of Florida.  *See* the application, attached as Exhibit "C."  That application sought to have the State of Florida approve the Plaintiff as a charitable organization that allegedly seeks to obtain fair housing.  Ryan Turizo falsely represented on the application's second page below his phone number that he does not have a criminal history and stated on the last page that the information he provided, including falsely informing the State of Florida that he did not have a criminal history, was "true and accurate."  *See id.* at Pages 2 and 3.  It would be inequitable to force the Defendant to remain a party to a lawsuit brought by an entity allegedly formed to help people with convictions obtain housing but whose president lied to the State of Florida about his own criminal history.

Furthermore, despite Ryan Turizo only recently incorporating the Plaintiff, he is a serial litigant who has filed over 20 lawsuits in the Southern District of Florida over the last 19 months. This action's operative complaint, like his prior complaints, is defective and subject to dismissal. For instance, this lawsuit was improperly brought in the Southern District against the Defendant, whose principal place of business is in the Middle District of Florida, regarding an apartment complex located in Melbourne, Florida.  In addition to venue not existing in this Court, the Amended Complaint fails to state a cause of action. The sole count is for allegedly violating 24 U.S.C. § 3604(d), which makes it unlawful to misrepresent based on race that a dwelling unit is not available to rent.  But, the Amended Complaint asserts the Defendant's agent told a tester, who was a felon, that the apartment complex would not rent to him because he was a felon.  Since she did not misrepresent the unit's availability, no cause of action exists and the Plaintiff lacks standing to sue on behalf of any members it has.  Moreover,  because the application submitted to the State of Florida said the Plaintiff has no expenses, the Plaintiff also lacks standing to sue on its own behalf because one of the criteria to sue on its own behalf is pleading it diverted resources and any such representation in the Amended Complaint is false based on the application's contents.  *See* Exhibit C, Page 3 (stating the Plaintiff spends no money on "[p]rogram services," "management," "general" expenses or fundraising).   Finally, the Plaintiff has not only failed to allege discrimination regarding the proper geographic area and relevant facts, data or statistics, the Amended Complaint also lacks the robust causality required by the United States Supreme Court. For all of these reasons, this Court should dismiss the Amended Complaint.

I.      **The Court Should Dismiss The Amended Complaint Because The Southern District Is An Improper Venue**

When jurisdiction is not founded on diversity, 28 U.S.C. § 1391(b) governs whether venue is proper.  Section 1391(b) provides that venue is proper in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391.  Furthermore, pursuant to 28 U.S.C. § 1391(d), "in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State."

Applying Section 1391 to the facts before this Court shows the Southern District of Florida is an improper venue.   The Amended Complaint makes the conclusory statement that "[v]enue in this District is proper because Plaintiff resides in this district, Defendant transacts business in this district, and the complained conduct of Defendant occurred in this district."   [D.E. 6 at ¶5]. However, Section 1391(b) only considers the defendant's residence so the Plaintiff's residence is immaterial.  *See Hicks v. Makaha Valley Plantation Homeowners Ass'n*, 2015 WL 328311, at *1 (D. Haw. Jan. 26, 2015) (denying venue in plaintiff's home state of Georgia for alleged housing discrimination relating to a property in Hawaii).  Although the Plaintiff concedes the property at issue is located in Melbourne, Florida, Paragraph Eight falsely represents the Defendant has its principal place of business in Boca Raton, Florida.  *See* [D.E. 6 at ¶¶8, 12].  As stated in the attached affidavit, the Defendant's principal place of business, like the property at issue, is located in the Middle District.  *See* the Affidavit of Justin Trimback, attached as Exhibit "D."  Furthermore, the Defendant's business activities are limited to owning the property in question, the Defendant does not have any employees in the Southern District of Florida, it does not advertise in the Southern District of Florida, none of the records regarding the Defendant are located in the Southern District of Florida, it does not solicit potential tenants known to be living in the Southern

District of Florida, it does not have business ties to the Southern District of Florida, it does not have any offices in the Southern District of Florida, one of the Defendant's members resides in Brevard County, Florida and the other member resides in Tennessee.  *See* Exhibit D.  Thus, Section 1391(b)(1) does not confer venue in the Southern District.

Turning to Section 1391(b)(2), the Amended Complaint's conclusory allegations about the Defendant's business transactions and where the alleged conduct occurred are equally baseless, contradicted by the attached affidavit and do not establish venue is proper in the Southern District of Florida.  *See generally Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988)  ("The facts as alleged in the complaint are taken as true to the extent they are uncontroverted by defendants' affidavits.").  "In analyzing whether the Southern District of Florida events or omissions are a 'substantial part' of the claims, the Court must 'focus on relevant activities of the defendant, not of the plaintiff.'" *Robey v. JPMorgan Chase Bank, N.A.*, 343 F. Supp. 3d 1304 (S.D. Fla. 2018) (quoting *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371-72 (11th Cir. 2003)).  "Only the defendant's activities 'that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered.'" *Robey*, 343 F. Supp. 3d at 1314 (quoting *Jenkins Brick*, 321 F.3d at 1371).  According to the Amended Complaint, the Defendant has a practice of turning away felons who seek to rent units at its Melbourne, Florida complex.  *See* [D.E. 6 at ¶17].  The Amended Complaint further asserts that on May 6, 2020, a field tester called the Melbourne, Florida location and spoke with someone named Julia.  *See* [D.E. 6 at ¶16].  The field tester allegedly asked Julia if his felony conviction would disqualify him from renting an apartment and Julia responded affirmatively.  *See id.*

Since the only relevant actions are the Defendant's, it is abundantly clear that the substantial activities giving rise to the alleged claim occurred in the Middle District of Florida. The Plaintiff cannot even rely on the single telephone call with Julia because it was the tester who initiated the call and the Eleventh Circuit has held that a defendant answering a telephone call does not subject the defendant to jurisdiction.  *See e.g. Sun Bank, N.A. v. E.F. Hutton & Co., Inc.*, 926 F.2d 1030, 1034 (11th Cir. 1991) (finding no personal jurisdiction where defendant merely received and returned phone calls from Florida, during which it made allegedly fraudulent statements).  *See also Hou v. United Airlines Corp.*, Case #: 8:06-CV-1502-T-27TGW, 2006 U.S. Dist. LEXIS 73790 (M.D. Fla. Oct. 10, 2006) (holding the plaintiff calling the defendant from the Middle District was insufficient to confer jurisdiction on the Middle District);  *Fox v. Boucher*,

794 F.2d 34, 37 (2d Cir. 1986) ("It would offend 'minimum contacts' due process principles to force [the defendant], a Massachusetts resident, to litigate in a New York forum on the basis of one telephone call.").  Finally, the Plaintiff is unable to rely on Section 1391(b)(3) because venue is proper in the Middle District of Florida.  This Court should consequently dismiss this action because the Southern District of Florida is an improper venue.

## II.      The Court Should Dismiss The Amended Complaint Because The Plaintiff Lacks Standing

"Because a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case . . . ." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).  "Article III of the United States Constitution 'restricts the jurisdiction of the federal courts to litigants who have standing to sue.'" *PDVSA US Litig. Trust v. Lukoil Pan Ams. LLC*, CASE NO. 1:18-CIV-20818-GAYLES, 2018 U.S. Dist. LEXIS 189801, *10  (S.D. Fla. Nov. 5 2018) (quoting *Nicklaw V. Citimortgage, Inc*., 839 F.3d 998, 1001 (11th Cir. 2016)).  Standing therefore "is not a mere pleading requirement but rather an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The "irreducible constitutional minimum of standing" comprises three elements: injury in fact, causation, and redressability. *See id.* at 560-61.  "Because the question of Article III standing implicates subject matter jurisdiction, it must be addressed as a threshold matter prior to the merits of any underlying claims."  *MSPA Claims 1, LLC*, Civil Action No. 18-23165-Civ-Scola, 2019 U.S. Dist. LEXIS 34386, *5 (S.D. Fla. March 5, 2019)  (*citing Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015)).

"A motion to dismiss for lack of subject matter jurisdiction brought under Federal Rule of Civil Procedure 12(b)(1) may present either a facial or a factual challenge to the complaint." *Murciano v. Fla. Agency for Health Care Admin.*, Case No. 18-21621-CIV-GAYLES, 2020 U.S. Dist. LEXIS 39765, *4 (S.D. Fla. March 9, 2020).  "Notwithstanding whether the challenge is facial or factual, '[t]he burden for establishing federal subject matter jurisdiction rests with the party bringing the claim.'" *Lambe v. Allgate Fin., LLC*, Case No. 16-cv-24407-GAYLES, 2017 U.S. Dist. LEXIS 113555, *3 (S.D. Fla. July 20, 2017) (quoting *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005)).  When, as here, the attack on standing is facial, the Plaintiff's allegations are taken as true for the purposes of the motion.  But the Plaintiff "must allege facts that affirmatively and plausibly suggest it has standing to sue." *Amidax Trad. Grp. v. S.W.I.F.T. SCRL*, 631 F.3d 140, 145 (2d Cir. 2011).  The Court cannot "speculate

concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none." *Miccosukee Tribe of Indians of Fla. v. Florida State Ath. Comm'n*, 226 F.3d 1226, 1229-30 (11th Cir. 2000).  Reviewing the Amended Complaint's clearly establishes the Plaintiff failed to satisfy its burden so it has no standing.

       **A.**       **The Plaintiff Lacks Standing To Sue On Behalf Of Its' Members**

       As stated above, the Plaintiff is suing the Defendant because it allegedly violated 42 U.S.C. § 3604(d) when contacted by a tester.  That section makes it illegal "[t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."  Although testers, by definition, do not have a "bona fide" intent to rent – therefore precluding standing under Section 3604(a) - the United States Supreme Court concluded that a "tester who has been the object of a ***misrepresentation*** made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the [FHA's] provisions." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 364 (1982) (emphasis added).  Applying these principles, the Supreme Court held in *Havens* that the black tester – who was *falsely* told that housing was unavailable – had standing to sue individually based on the injury to her statutory right to truthful housing information under Section 3604(d).  *See id.* at 374.   On the other hand, the white tester in *Havens*, who was correctly told that housing was available, did not have standing because he did not allege "that he was the victim of a discriminatory misrepresentation," and therefore had not pled a cause of action under Section 3604(d).  *See id.* at 374-75.

       In light of *Havens*, an association such as the Plaintiff would only have standing to sue on behalf of its alleged members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  Here, the Amended Complaint does not allege the Plaintiff is a membership organization; that the "tester" is a member; or that the Plaintiff is bringing suit on a member's behalf.  But in the event the Plaintiff nevertheless attempts to claim associational standing, the tester in the case before this Court lacks standing for the same reasons as the white tester in *Havens*. The tester did not make a bona fide offer to rent which means it did not have standing under Section 3604(a). *See Houston v. Marod Supermarkets,*

*Inc.*, 733 F.3d 1323, 1333 (11th Cir. 2013) ("a plaintiff seeking redress for an alleged refusal to sell or to rent housing on the basis of race must have made an actual 'bona fide' offer—not a mere 'tester' Congress said so expressly in § 804(a) of the FHA."). Furthermore, and viewed in the light most favorable to the Plaintiff, the tester was *truthfully* told that his felony conviction disqualified him from available housing – not that he was *falsely* told that available housing was *un*available. Since the individual the tester spoke to did not make misrepresentations about the availability of units, Section 3604(d) also does not confer standing. *See Havens*, 455 U.S. at 373. The Plaintiff has consequently failed to establish "tester" standing under *Havens*. As such, the tester did not suffer a cognizable injury under the FHA and the Plaintiff lacks standing to sue on the tester's behalf. This Court should consequently dismiss the Amended Complaint.

**B.      The Plaintiff Lacks Standing To Sue On Its Own Behalf**

Regarding organizational standing, the United States Supreme Court held in *Havens* that an organization may establish Article III standing if it shows "a concrete and demonstrable injury to the organization's activities" that is "more than simply a setback to the organization's abstract interests." Following *Havens*, the United States Court of Appeals for the Eleventh Circuit has held an organization only has standing to sue on its own behalf if "the defendant's *illegal acts* impair its ability to engage in its projects by forcing the organization to devote resources to counteract those illegal acts." *Common Cause/Georgia v. Billups*, 554 F.3d 1350 (11th Cir. 2009) (emphasis added). For the reasons stated in Part III, the Amended Complaint does not state a plausible claim of unlawful discrimination so the Court does not need to consider if the Plaintiff adequately pled a "diversion of resources."

Nevertheless, even if this Court considers the Amended Complaint's "diversion of resources" allegations, those arguments like the rest of the Amended Complaint, are baseless. To qualify as a cognizable Article III injury, the organization's diverted resources must be independent of the cost of detecting and challenging allegedly unlawful conduct. *See Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008) ("plaintiffs cannot bootstrap the cost of detecting and challenging illegal practices into injury for standing purposes"). For instance, in *Havens* the organizational plaintiff, HOME, alleged it was a housing nonprofit offering housing counseling and referrals. *See Havens*, 455 U.S. at 363. A landlord discriminated against HOME's clients by falsely claiming that housing was unavailable which forced HOME to expend additional resources to find these clients alternative housing. *See id*. at 379. HOME was also forced to divert resources from its counseling efforts by using paired black and white testers

to confirm the landlord's discriminatory policies, and engage in litigation. *See id*. at 368.

Unlike the well-plead allegations in *Havens* about how and why the landlord's racial discrimination required HOME to divert resources from housing referrals and counseling to testing and litigation, the Amended Complaint merely contains impermissible "naked assertions devoid of further factual enhancement." *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013). The Plaintiff offers no affirmative, plausible allegations – even on a general level - about *how* the Defendant's alleged practice of rejecting an unsubmitted rental application impaired the Plaintiff's "counseling," "education" and "outreach" and "projects." *See* [D.E. 6 at ¶31]. Tellingly, the Amended Complaint lacks any details about these interrupted services or "projects," what "resources" were "diverted," or why the Plaintiff was "forced" to pursue litigation. More importantly, the tester made the call on May 6, 2020, the Plaintiff informed the State of Florida on June 23, 2020, that it did not have expenses and the Plaintiff commenced litigation on June 26, 2020. *See* Exhibit C. *See generally* [D.E. 1]. By its own admission to the State of Florida, the Plaintiff had no expenses as of June 23, 2020, and even if it incurred any expenses within the 3 days before it filed suit, no allegation establishes the amount of funds diverted were significant enough to meet the Article III test that an organization's injury be "palpable." Without even general allegations on these issues, the Plaintiff cannot establish causation or redressability. It would also be unjust for the Plaintiff's vague comment about a diversion of resources to force the Defendant to incur litigation expenses when the Plaintiff said 3 days before this lawsuit commenced that it has no expenses.

Indeed, the Amended Complaint's only allegations of ultimate fact prove litigation is the Plaintiff's *raison d'être*. It is easily inferred from Paragraph Sixteen's description of the tester's conversation with "Julia" that their entire exchange was extremely brief. Even if he spent an additional minute memorializing the words that were exchanged, the "injury" suffered is best described as *de minimus,* not palpable. *See Havens Realty Corp.*, 455 U.S. at 379 (stating the injury must perceptively impair organization's ability to provide other services). More importantly, because the pleading describes no costs beyond making that phone call and the litigation costs – a practice rejected in this circuit as impermissible bootstrapping insufficient to establish organizational injury – the Plaintiff has not established it suffered an injury, that the Defendant caused it, or that this Court can redress it. *See Browning*, 522 F.2d at 1166. This is another reason why the Court should dismiss the Amended Complaint. *See also Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (finding organization "does not allege impairment of

its ability to provide services" when it alleges "only impairment of its advocacy"); *Shield Our Constitutional Rights & Justice v. Hicks*, 2009 U.S. Dist. LEXIS 103006, *13 (D. Md. Nov. 4, 2009) ("Plaintiffs appear to allege that Shield suffered injury as a result of having to divert its resources from other programs in order to assist Plaintiff Huang. However, Plaintiffs fail to allege any specific facts to substantiate this bald allegation. . . . Plaintiffs' conclusory assertions are insufficient to establish organizational standing.").

Separately, there are no allegations supporting a "real or immediate threat of future injury" that would support the Plaintiff having standing to seek injunctive relief.  *See Am. Civil Liberties Union of Fla. v. Miami-Dade Cty. School Bd.*, 557 F.3d 1177, 1197 (11th Cir. 2009) (for injunctive relief, "there is either an imminent injury or there is not.  If there is not, there is no standing. . . . All the plaintiff has to do is describe the threatened injury and why it is imminent. The penalty for failing to do so is dismissal for lack of standing"). Indeed, the Amended Complaint's conclusory allegation of "irreparable loss and injury and a real and immediate threat of future discrimination" is unsupported by any factual allegations, and therefore is precisely the type of conclusory, "the-defendant-unlawfully-harmed-me" pleading deficiency disapproved by the United States Supreme Court.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III.    This Court Should Dismiss The Amended Complaint Because It Fails To State A Claim for Disparate Impact Discrimination

When a defendant files a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court must determine if the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombl*y, 550 U.S. 544, 570 (2007).  The complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Mere labels and conclusions or a formulaic recitation of the elements of a cause of action will not do, and a plaintiff cannot rely on naked assertions devoid of further factual enhancement." *Franklin*, 738 F.3d at 1251.  To survive, a plaintiff must "raise a right to relief above the speculative level" and "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547.  Although courts are required to accept allegations as true and make all plausible inferences in the plaintiff's favor, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555.

Cherry-picking language from *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct.  2507 (2015), the Plaintiff contends statistical

evidence is unnecessary to establish disparate impact liability because the Supreme Court stated constitutional problems would occur if liability was only imposed based on a statistical disparity. *See* [D.E. 6 at ¶36].  Based on the Plaintiff's flawed interpretation, the Amended Complaint's entire argument is that this Court should hold the Defendant allegedly denying housing to felons is discriminatory because a greater percentage of the nation's total population of Black and Hispanic individuals are convicted of felonies more often than Caucasians. *See e.g.* [D.E. 6 at ¶¶1-2 and 10-11].  The Amended Complaint then disregards *Twombly's* pleading requirements and, without any supporting facts, makes impermissible and formulaic legal conclusions that "Defendant's practice or otherwise policy regarding the criminal history of individuals seeking to rent," has "a disparate impact on Black and Hispanic individuals and otherwise fails to serve a substantial, legitimate, nondiscriminatory interest of the housing provider."  *See* [D.E. 6 at ¶30]. The Amended Complaint next asserts the Plaintiff has been aggrieved, its goals thwarted, has suffered damages and will continue to suffer damages in the future.  *See e.g.* [D.E. 6 and ¶¶46-47]. These boilerplate allegations and conclusions fail to state a cognizable disparate impact housing discrimination claim.  Additionally, the Plaintiff's argument and conclusions are fundamentally flawed and  have been repeatedly rejected.

Claims of disparate impact discrimination under the Fair Housing Act are subject to heightened pleading standards.  Pursuant to the United States Supreme Court's decision in *Inclusive Communities Project, Inc.*, racial imbalance, standing alone, does not establish a prima facie claim of disparate impact housing discrimination.  Thus, "it is not enough to simply allege that there is a disparate impact . . . or point to a generalized policy that leads to such an impact." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)).  Instead, "[d]isparate-impact liability under the Fair Housing Act requires proof that a policy or practice of the defendant has a 'disproportionately adverse effect on minorities.'" *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1296 (11th Cir. 2019) (quoting *Inclusive Cmtys.*, 135 S. Ct. at 2513).  "Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and 'would almost inexorably lead' governmental or private entities to use 'numerical quotas,' and serious constitutional questions then could arise." *Inclusive Cmtys.*, 135 S. Ct. at 2523.  "Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important. A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id.*  Directly rejecting

the Amended Complaint's argument that the Plaintiff can satisfy its burden merely by stating Black and Hispanic people are convicted nationally more than Caucasians, the Supreme Court remarked:

> [d]ifficult questions might arise if disparate-impact liability under the FHA caused race to be used and considered in a pervasive and explicit manner to justify governmental or private actions that, in fact, tend to perpetuate race-based considerations rather than move beyond them. Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision.

*Id.* at 2524. "The limitations on disparate-impact liability discussed here are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.*

Based on the concerns mentioned above, a plaintiff must satisfy three requirements to plead a claim for disparate-impact liability. "First, a prima facie case requires 'the identification of a specific, facially-neutral . . . practice' or policy." *City of Miami Gardens,* 931 F.3d at 1296 (quoting *EEOC v. Stone Crab, Inc.*, 220 F.3d 1263 1268 (11th Cir. Aug. 4, 2000)). "Second, the plaintiff must establish the existence of a 'significant statistical disparity' between the effects of the challenged policy or practice on minorities and non-minorities." *City of Miami Gardens*, 931 F.3d at 1296 (quoting *Joe's Stone Crab,* 220 F.3d at 1274). "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Inclusive Cmtys.*, 135 S. Ct. at 2523. Furthermore, a disparate-impact claim "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* "Third, in the light of the 'serious constitutional questions that might arise . . . if such liability were imposed based solely on a showing of statistical disparity,' a plaintiff proceeding on a disparate-impact theory must also establish a 'robust causality' connecting the challenged policy and the statistical disparity." *City of Miami Gardens*, 931 F.3d at 1296 (quoting *Inclusive Cmtys.*, 135 S. Ct. at 2512). "A robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Inclusive Cmtys.*, 135 S. Ct. at 2523 (citing *Wards Cove Packing Co. v. Atonio*, 490 U. S. 642, 653 (1989), superseded on other grounds, 42 U. S. C. §2000e-2(k)). The Plaintiff has not satisfied its' burden.

### A.      The Amended Complaint Fails To Utilize Relevant Statistics And Data

As stated above, the Eleventh Circuit held in *City of Miami Gardens* that "the plaintiff must establish the existence of a 'significant statistical disparity' between the effects of the challenged

policy or practice on minorities and non-minorities." 931 F.3d at 1296. The Eleventh Circuit has held a plaintiff fails to satisfy that requirement if the plaintiff did not utilize statistics from the relevant geographic area. For instance, in *Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo*, 759 Fed. Appx. 828 (11th Cir. 2018), real estate developers in the Oviedo Town Center sued the City of Oviedo (the "City") for violating the Fair Housing Act and asserted the City changing its utility rate policies caused a disparate impact on minorities. According to the Eleventh Circuit, "in order to establish a prima facie case of disparate impact, the appellants would have needed to draw a comparison between (a) the percentage of racial minorities occupying multifamily properties impacted by the 2012 Policy throughout the City of Oviedo and (b) the percentage of non-minorities living in such properties, again throughout the City of Oviedo." *Oviedo Town Ctr. II, L.L.L.P.*, 759 Fed. Appx. at 835. "This kind of citywide comparative analysis would be necessary because, since the policy impacts the whole city, the whole city would need to be evaluated before we could determine that the claimed impact might have disparately fallen on certain insular groups." *Id.* Instead of submitting that information, the plaintiffs relied on data showing the percentage of racial minority heads of households in the Oviedo Town Center was greater than the percentage of racial minority households throughout the City of Oviedo. *See id.* at 833. The Eleventh Circuit held "this data revealed only that more racial minorities live in Oviedo Town Center than lived in the rest of the City of Oviedo. It does not establish a disparate impact, let alone any causal connection between the 2012 Policy and the disparate impact." *Id.* at 835. The Eleventh Circuit said its evaluation "need go no further because this necessarily fails to make out a prima facie case." *Id.* at 836. "[T]he developers here have 'completely failed to present relevant comparative evidence' and 'the district court was right to reject [the] disparate impact claim.'" *Id.* (quoting *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008)).

Like the developers in *Oviedo Town Ctr. II, L.L.L.P.*, the Plaintiff in this action has also failed to satisfy its burden. In addition to having boilerplate allegations and conclusions, the Amended Complaint is devoid of relevant statistics or data and a causal connection. Pursuant to *Oviedo Town Ctr. II, L.L.L.P*, the Plaintiff would have needed to draw a comparison between (a) the percentage of African Americans and Hispanic individuals occupying apartments at the Palm Bay Grand and (b) the percentage of African Americans and Hispanic individuals who applied for housing at Palm Bay Grand. Disregarding the binding precedent, the Amended Complaint merely relies on HUD Guidelines, national arrest and incarceration data from the Bureau of Justice Statistics, and the U.S. Department of Commerce's data from 2010 about the total number of

minorities in the United States compared to non-minorities.  *See* [D.E. 6 at ¶¶10-11].  More specifically, even though the Amended Complaint contends statistics are not required, and despite this lawsuit concerning whether discrimination occurred in 2020 at a property in Melbourne, Florida, the Amended Complaint perplexingly relies on 2010 national statistics for its' argument that "63% of the population is White, 13% of the population is Black, 16% of the population is Hispanic."  [D.E. 6 at ¶10].  Not only are 2010 national averages irrelevant because they do not pertain to the appropriate geographic area, the 2010 national averages are significantly different from the U.S. Census Bureau's 2019 statistics for Melbourne.  According to the U.S. Census Bureau, in 2019 Brevard County, which is where Melbourne is located, had a population that was 82.7% White.[4]  Focusing on Melbourne, in 2019 it had a population that was 78.9% White, which is 15.9% greater than the 2010 national average.[5]  Regarding minorities, the 2019 Melbourne statistics for Black and Hispanic individuals are lower than the 2010 national averages.  In 2019 Melbourne's population had 2% fewer Black people and 4.5% fewer Hispanics than the 2010 national averages.  *See id.*  Those differences are important because the U.S. Supreme Court and Eleventh Circuit require statistics and data to be comparative to the property in question.

The Plaintiff's reliance on nationwide arrest and incarceration data and statistics is equally misplaced because the total number of people incarcerated in the United States, or even the total just for Florida, is irrelevant to this lawsuit because the Defendant is not being sued for a policy it imposed on the entire Country or on individuals who are incarcerated.  Instead, the issue before this Court is whether the Defendant's policy at a Melbourne property discriminates against individuals who are Black or Hispanic, are not incarcerated and are interested in living at the property.  None of the Plaintiff's sources or data contains pertinent information such as the percentage of felons living in Melbourne compared to Melbourne's total population, the races of people living in Melbourne who are and are not felons, or any information regarding the races or criminal histories of the people who are living at, or merely applied to, the Melbourne property.  The Amended Complaint has not even alleged the property's racial composition is not representative or either Melbourne or Brevard County.  Thus, pursuant to the Eleventh Circuit prohibiting a "bald assumption" with "no comparative data at all," the Plaintiff has failed to plead that a robust causal connection shows the Defendant's policy of excluding felons has caused a disparate impact.  This is another reason why the Court should dismiss the Amended Complaint.

---

[4] *See* https://data.census.gov/cedsci/profile?g=0500000US12009.
[5] *See* https://www.census.gov/quickfacts/fact/table/melbournecityflorida/PST045219

*See Oviedo Town Ctr. II, L.L.L.P.*, 759 F. App'x at 835.  *See also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir.  2008) ("Gulf Coast presented no comparative data at all, relying instead on the bald assumption that because the halfway houses at issue in this case cannot be used for short-term group living, the occupancy-turnover rule must necessarily create a disparate impact on the handicapped. . . . Because Gulf Coast has completely failed to present relevant comparative evidence, the district court was right to reject its disparate impact claim.").

**B.   The Amended Complaint Does Not Satisfy The Supreme Court's Robust Casualty Standard**

Along with omitting relevant statistics and data, the Amended Complaint also fails to allege a causal link between the policy and statistical disparities as required by the Supreme Court's "robust causation standard."   The Amended Complaint would have needed to plead that the Defendant's policy of allegedly denying applications submitted by felons has caused a disparate impact at that Melbourne, Florida location.   Instead, the Amended Complaint merely repeatedly argues the policy is discriminatory because individuals affected by it are minorities and in 2010 the national averages for Black and Hispanic people convicted of felonies was greater than the number of Caucasians who were convicted.   Since the Plaintiff has not asserted any data showing the racial makeup of convicted felons in the Defendant's actual or potential tenant pool of Melbourne, Florida, the Plaintiff is apparently hoping that extrapolation of nationwide data regarding arrests and incarcerations will yield parallel results at the community level and in particular the property in Melbourne, Florida where the alleged discrimination took place.   Such speculation, however, hardly establishes the required "robust" causation necessary to state a claim for disparate impact regarding felonies in Melbourne.   Nor is this extrapolation even possible because the 2019 statistics for Melbourne are significantly different from the 2010 national averages.   Furthermore, the Honorable Jose A. Gonzalez, Jr. of the United States District Court for the Southern District of Florida already rejected the argument that all policies have a disparate impact against minorities.   *See E.E.O.C. v. Carolina Freight Carriers Corp.*, 723 F. Supp. 734, 752 (S.D. Fla. 1989) ("plaintiff's position that minorities should be held to lower standards is an insult to millions of honest Hispanics.").   The Amended Complaint therefore fails to plead a cause of action that the Defendant allegedly denying housing to felons caused a disparate impact at that Melbourne, Florida location.   This is yet another reason why the Plaintiff has failed to satisfy its burden and this Court should dismiss the Amended Complaint.   *See also Inclusive Communities Project, Inc. v. Heartland Cmty. Ass'n, Inc.*, 399 F. Supp. 3d 657, 667 (N.D. Tex. 2019) (granting

motion to dismiss disparate impact housing discrimination claim for failure to plead robust causation between policy and statistical racial disparities).

### C.   Courts Have Held Denying Housing To Felons Can Serve A Legitimate Purpose

As stated above, the Amended Complaint contends a blanket denial of housing to felons is always discriminatory.  However, courts throughout the United States have held defendants do not violate the Fair Housing Act when their race neutral policies result in denying housing to felons. For instance, in *Carson v. Hernandez*, 2018 U.S. Dist. LEXIS 185782 (N.D. Tex. July 26, 2018), the plaintiff sued VOA/Prairie Creek Village Apartments and its manager, Sofia Hernandez, alleging violations of the Fair Housing Act.  *See Carson v. Hernandez*, CIVIL CASE NO. 3:17-CV-1493-L-BK, 2018 U.S. Dist. LEXIS 185782 *1 (N.D. Tex. July 26, 2018).  The plaintiff in that case, like the Plaintiff in the instant action, contended the facility denying his rental application because of felony convictions "'amounts to a ban against African-Americans and has an adverse discriminatory effect,' because, as an African American, he 'is part of a disproportionate number of those convicted and imprisoned and convicted in Texas.'"  *Carson*, 2018 U.S. Dist. LEXIS 185782 at *2.  In support of that argument the plaintiff asserted:

> In 2014, African-American [sic] comprised approximately 36 percent of the total population, yet [sic] incarcerated at a rate nearly three times their proportion of the General Population. The Defendants [sic] Practice and Policy that deny Housing to those Released from Prison is critical for any successful reentry to society, and such policy is equally disparate and discriminates against African-Americans.

> This in conjunction with the racial aspect of those that are convicted in Texas, in 2005, the racial conviction rate in Texas per 100,000 of the Population came to: 'Whites 667; Blacks 3167; Hispanics 830.' . . . The Defendants Policy represents a discriminatory policy.

*Id.* at *3-4

When ruling on the defendant's motion to dismiss the United States District Court for the Northern District of Texas noted the "Plaintiff has not identified any specific policy or practice of Defendants that caused a disparate impact on a protected group.  He avers only generally that the 'practice and policy' to deny housing to those released from prison and cites a purported disparate impact on African Americans based on statistical data."  *Id.* at *6.  That court further stated "[a]ssuming, arguendo, that Defendants had a policy of rejecting applicants with felony convictions, regardless of the age of those convictions, Plaintiff has wholly failed to demonstrate a 'robust' causal connection between the alleged policy or practice and the perceived adverse

discriminatory effect." *Id.* This is because "a policy of excluding convicted felons from tenancy did not cause the underlying disparity Plaintiff cites, to-wit, the historical disproportion of African Americans convicted of felony offenses in the United States. [] In any event, such a policy is not 'otherwise unjustified by a legitimate rationale,' as it is obviously pertinent to maintaining a crime-free environment." *Id.* at \*7. Since the complaint contained "no facts that would support the plausible inference of a 'robust' causal link between a specific policy or custom of Defendant and an adverse effect on African Americans," the court dismissed the complaint with prejudice *See id.* at \*7, 11. Just like the complaint in that case, the Plaintiff's Amended Complaint should be dismissed because it lacks data showing (1) the alleged policy excluding convicted felons from the subject housing causes a disparate impact and (2) there is a robust causal connection.

The United States District Court for the Southern District of New York reached the same conclusion. In *McKins v. Pye*, 2019 U.S. Dist. LEXIS 123450 (S.D.N.Y. July 22, 2019), an African American male was arrested in 1983 and convicted in 1984. In 2018 an apartment complex informed him that a unit was available to rent but his application was denied because of his prior arrest and conviction. The district court held those allegations failed to establish a disparate-impact claim under the Fair Housing Act because they do not "plead facts demonstrating that [the apartment complex] has a policy or practice that has caused or predictably will cause a discriminatory effect." *McKins*, 2019 U.S. Dist. LEXIS 123450 at \*5. *See also Hall v. Phila. Hous. Auth.*, 2019 U.S. Dist. LEXIS 60679 \*10-11 (E.D. Pa. April 9, 2019) (dismissing a complaint because it was permissible to have a policy that rejected all applicants who had a household member who had been convicted of a homicide-related offense); *Evans v. UDR, Inc.*, 644 F. Supp. 2d 675, 691 (E.D.N.C. 2009) ("the FHAA clearly does not prohibit landlords from denying a person occupancy on the basis of his criminal record"). Thus, the premise advanced by the Plaintiff in the instant action does not support a claim as a matter of law and the Court should dismiss the Amended Complaint with prejudice.

**D.    The Amended Complaint's Reliance On HUD Guidance Is Irrelevant**

As stated above, the Amended Complaint contends this Court should hold a denial of housing to felons is discriminatory based on HUD's Guidance from 2016. *See* [D.E. 6, Page 7]. The Plaintiff's reliance on, and citations to the 2016 HUD Guidance is woefully misplaced. The HUD Guidance does not say an entity violates the FHA by utilizing a policy that denies all rental applications submitted by felons. The HUD Guidance actually says blanket denials, like any other challenged policy, that are shown to have a discriminatory effect would violate the FHA. The

HUD Guidance further explains that a policy which implements an "individualized assessment" of criminal record "is likely to have a less discriminatory effect." *See* HUD Guidance at Page 7.

Disregarding what the HUD Guidance states, the Plaintiff has stretched HUD's proposition and contends a blanket prohibition regarding an applicant's "felony" criminal history "is unlawful under the Fair Housing Act" because all blanket prohibitions are allegedly discriminatory. *See* [D.E. 6 at ¶28]. Based on its misconception about what the HUD Guidance says, the Plaintiff asserts Palm Bay Grand should be required to revise the way it uses criminal records. *See* [D.E. 6 at ¶ 32]. However, HUD's Guidance cannot be stretched to conclude that every policy which omits an individualized assessment is discriminatory. Any particular race-neutral policy may only be discriminatory when shown statistically to have caused a disparate impact on a protected class. The Plaintiff's statement regarding the HUD Guidance is therefore incorrect, its application to the facts before this Court reaches an unsubstantiated conclusion and the alleged failure to conduct an individualized assessment of an applicant's background does not support a claim for disparate impact discrimination.

Not only has the Plaintiff misconstrued HUD's 2016 Guidance, its reliance on that document is immaterial because Agency Guidance is not the law. Courts allow an agency "a measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012) (quoting *United States v. Mead Corp.*, 533 U. S. 218, 228 (2001)). The United States Court of Appeals for the Eleventh Circuit has previously held *Skidmore* affords a "lesser," and "more limited" degree of deference than *Chevron. See Rodriguez v. Farm Stores Grocery, Inc*., 518 F.3d 1259, 1268 n.5 (11th Cir. 2008). Thus, an agency's interpretation has the "power to persuade" but "lack[s] the power to control." *Skidmore v. Swift & Co.*, 323 U. S. 134, 1140 (1944).

In *Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849 (11th Cir. 2009), the Eleventh Circuit discussed how much weight should be given to HUD Guidelines. According to the Eleventh Circuit, "[b]ecause the HUD Guidelines are not 'published regulations subject to the rigors of the Administrative Procedure Act, including public notice and comment,' they do not deserve full Chevron deference." *Stein, LLC*, 586 F.3d at *6. The Eleventh Circuit explicitly said "great weight" was "far more weight than we can give them under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)." *Stein*, 586 F.3d at n.4. In fact, the Eleventh Circuit said "[l]ittle or no deference is due to the guidelines," because "[n]o reasoning at all, much less thorough reasoning, is provided"

for a proposition and the guidelines were internally inconsistent. *Id.* at n.6.

Finally, even if the HUD Guidance was binding on this Court, which it is not, the HUD Guidance heavily relies on the United States Court of Appeals for the Eighth Circuit's decision in *Green v. Missouri Pac. R.R. Co.*, 523 F. 2d 1290 (8th Cir. 1975), for the proposition that blanket denials for "any conviction," could support a disparate impact claim.  In *Green*, the plaintiff sued for employment discrimination based on the employer's policy of disqualifying all job applicants with a conviction for any crime other than a minor traffic offense. *See Green*, 523 F.2d at 1292. The Eighth Circuit held the company's policy violated Title VII because it could not meet the business necessity test. *See id.* at 1296-98.

Not only does the case before this court not concern employment discrimination, after HUD issued the 2016 Guidance the Eighth Circuit clarified *Green* in *Eggers v. Wells Fargo Bank N.A.*, 899 F.3d 629, 634-35 (8th Cir. 2018).  In *Eggers* the Eighth Circuit discussed *Green* and said blanket denials for all for employment applicants convicted of theft crimes did not support a prima facie claim for disparate impact discrimination.  Since the Eighth Circuit has modified *Green*, HUD's reliance on *Green* is no longer justified.

Despite the Eighth Circuit using *Eggers* to clarify *Green*, the Plaintiff has misconstrued *Green* to mean that any policy which excludes applicants on the basis of any conviction is prohibited.  As stated above, that is not the law in the Eighth Circuit and, more importantly, it is also not the law in  the United States District Court for the Southern District of Florida.  In *EEOC v. Carolina Freight Carriers Corp.*, 723 F. Supp. 734 (S.D. Fla. 1989) Francisco Rios was convicted of a felony and sentenced to prison.  When he applied to work at Carolina Freight Carriers Corp. he lied on the application and said he was never convicted of a crime other than a traffic offense.  *See EEOC*, 723 F. Supp. at 737.  Although he was initially hired, the district manager eventually fired him because of his conviction.  *See id.* at 742, 749.

The Equal Employment Opportunity Commission ("EEOC") subsequently sued Carolina Freight Carriers Corp. in the Southern District of Florida for maintaining a discriminatory employment practice.  *See id.* at 750.  Relying on *Green*, the EEOC asserted Carolina Freight Carriers Corp. refusing to employ people with a felony conviction had a disparate impact upon Hispanics.  *See id.*  The Southern District of Florida rejected that argument because

> While *Green* could be limited to those situations where the linkage between the employer's business needs and the conviction policy is minimal, the case may also be broadly read to bar all employment conviction policies. With all due respect to the members of the Eighth Circuit, their holding is ill founded.

*Id.* at 752.  The Southern District further said the EEOC failed to establish that any imbalance in the number of Hispanic drivers was caused by the conviction bar.  *See id.* at 751.  Nor did the EEOC establish a "significant number" of Hispanic drivers were disqualified because of the conviction policy or deterred from applying because of the policy.  *See id.*  When entering a judgment against the EEOC, The Honorable Jose A. Gonzalez, Jr. stated "plaintiff's position that minorities should be held to lower standards is an insult to millions of honest Hispanics." *Id.* at 752, 756.  He also stated the following, which contradicts this action's Amended Complaint:

> [a] past criminal record affords no basis to predict that a given person will commit a future crime. But the evidence indicates that a group of persons who have been convicted of serious crimes will have a higher incidence of future criminal conduct than those who have never been convicted.

*E.E.O.C.*, 723 F. Supp. at 753.  Accordingly, the Plaintiff's Amended Complaint is fundamentally flawed because it is based on *Green*, a non-binding decision from the Eighth Circuit, that is contrary to that Circuit's law governing criminal background policies in the disparate impact discrimination context.  More importantly, the Southern District of Florida has rejected *Green*.  The Amended Complaint consequently fails to state a cause of action and should be dismissed.

Other federal appellate courts have also held a plaintiff cannot rely on agency guidelines to establish disparate-impact liability.  For instance, in *Hardie v. NCAA*, 876 F.3d 312 (9th Cir. 2017), the plaintiff, who was an African American, sued the National Collegiate Athletic Association ("NCAA") because the NCAA excluded individuals with felony convictions from coaching at youth athletic tournaments.  The plaintiff contended that excluding all individuals with felony convictions has a disparate impact on African Americans.  *See id.* at 315, 318.  In addition, the plaintiff in that case, like the Plaintiff in the case before this Court, relied on EEOC Guidelines to avoid discriminating based on race.  *See id.* at 323.  The EEOC Guidelines were similar to HUD's and recommended employers adopt individualized assessments as a tool to avoid Title VII liability in the employment context.  *See id.*

On appeal to the United States Court of Appeals to the Ninth Circuit, the NCAA asserted excluding coaches with felony convictions served the interest in protecting children and the integrity of the NCAA's recruiting process because "even after many years have passed, the risk of future arrest for someone who has a criminal record may remain higher than the risk of future arrest for someone who has never been arrested."  *See id.* at 321.   The United States Court of Appeals for the Ninth Circuit ultimately rejected the plaintiff's reliance on the EEOC Guidelines and affirmed the order appealed.  *See id.* at 323.  That decision consequently provides an additional

reason why this Court should reject the Amended Complaint's flawed assertion that failing to conduct HUD's suggested individualized assessment constitutes discrimination.

**IV.     The Plaintiff's Citations Are Improper And Do Not Plead A Cause Of Action**

Divisions of the Southern District of Florida have held it is inappropriate for complaints to contain citations.  *See e.g. Drummond v. Zimmerman*,   CASE NO. 19-81532-CIV-SINGHAL, 2020 U.S. Dist. LEXIS 65234, *9 (S.D. Fla. April 13, 2020) (stating "legal arguments and citations to other cases [] are not matters properly raised in a Complaint.").  The Amended Complaint nevertheless spends contains a voluminous quantity of case's quotations in an attempt to plead a cause of action.  Including those quotations does not excuse or justify the Plaintiff's failure to plead facts or relevant data and statistics.  Nor should the Court presume the quotations have any relevance to the instant action.  For example, the Amended Complaint quoted language from *Inclusive Communities* regarding "heartland" lawsuits.  *See* [D.E. 6 at ¶34].  But, the case before this Court is not a "heartland" case because the Supreme Court identified that type of claim as one concerning challenges to zoning laws, ordinances, and other governmental housing restrictions. *See Inclusive Communities,* 576 U.S. at 539-40.

**V.     A Single Call Does Not Establish A Disparate Impact**

To demonstrate actionable discrimination, a defendant's misconduct must be more than isolated to rise to the level of actionable pattern or practice.  *See Bryant Woods Inn, Inc. v. Howard Cty.*, Md., 911 F. Supp. 918, 940 (D. Md. 1996).  Yet, based on a single telephone call, the Plaintiff contends it brought this action based on how the Plaintiff believes the Defendant would act if the Defendant merely "suspected" someone of being a felon.  *See* [D.E. 6 at ¶¶1-2].  Julia's response to a single tester regarding that tester stating he is a felon does not constitute a practice and the Plaintiff cannot be permitted to extrapolate what Julia said the Defendant would do if the tester was a felon to plead a cause of action regarding how the Defendant might act if it merely suspected someone is a felon.

For all these reasons, this Court should dismiss the Plaintiff's Amended Complaint.  The dismissal should be entered with prejudice because any attempt to amend would be futile.

Respectfully submitted,

HINSHAW AND CULBERTSON, LLP

s/MELISSA GILLINOV
Melissa Gillinov, Esq.
Florida Bar No. 11892

mgillinov@hinshawlaw.com
2525 Ponce de Leon. Blvd.
Miami, Florida 33434
Telephone: 305-358-7747
Facsimile: 305-577-1063
*Counsel for The Palm Bay Grand, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2020, I e-filed this document using the CM/ECF system.  I further certify that I am unaware of any non-CM/ECF participants.

/s/MELISSA GILLINOV
Melissa Gillinov